IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ROGER CURRIER,

        Plaintiff,

v.                                            Case No.  24-4084-JWB

MENARD, INC.,

        Defendant.

## MEMORANDUM DECISION

Plaintiff Roger Currier ("Plaintiff" or "Mr. Currier") brought this negligence action against Defendant Menard, Inc ("Defendant" or "Menard").  He seeks damages for injuries sustained when he tripped and fell on his way into a shopping center owned by Defendant.

On July 29, 2024, Plaintiff filed a petition against Defendant in the District Court of Shawnee County, Kansas.  (Doc. 1 at 1.)  Defendant was served on August 6, 2024.  (*Id.*)  On August 23, 2024, Defendant removed the action to this court on the basis of diversity jurisdiction through the federal removal statute at 28 U.S.C. § 1446.  (*Id.*)  Because Plaintiff is a citizen of Kansas and Defendant is incorporated and has its principal place of business in Wisconsin, the parties are completely diverse.  (*Id.* at 2.)  Plaintiff's petition sought damages in excess of $75,000, so accordingly, this court's jurisdiction is proper under 28 U.S.C. § 1332(a)(1).  (Doc. 1-1 at 5.)

1

This case was leanly litigated. This court entered a pretrial order on March 7, 2025, containing only one count of negligence. (Doc. 35 at 5.)[1] There were no motions to dismiss, *Daubert* motions, motions in limine, or motions for summary judgment. The court presided over a bench trial from December 8-9, 2025, and took the matter under advisement. The court has thoroughly considered the evidence and arguments presented at trial, the parties' post-trial submissions, the transcripts and deposition designations, and the relevant law, and makes the following findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

For the reasons explained herein, the court directs the clerk to enter judgment for DEFENDANT on Plaintiff's negligence claim.

## I.     Findings of Fact

Plaintiff is a 76-year-old man from Topeka, Kansas. (Doc. 55 at 47.) For most of his life he has been in the rental business and has owned and maintained various pieces of property, typically renting them out for business purposes. (*Id.* at 48.) He owns a shopping center in Topeka that contains several businesses. (*Id.*) For the most part, Plaintiff did the maintenance and upkeep on this shopping center himself, though for bigger projects he had some help. (*Id.*) In "about 2015" Plaintiff became acquainted with Mr. Aaron Smith who began conducting work for Plaintiff's rentals. (*Id.* at 38.) Mr. Smith has conducted lots of handyman type work for Plaintiff in the intervening period. (*Id.*) When he began working for Plaintiff, Mr. Smith typically worked

---

[1] The court notes that in the pretrial order, under "Plaintiff's Claims" it says: "Plaintiff asserts that he is entitled to recover upon the following theory(ies): i. Violation of the ADA. ii. Negligence." (Doc. 35 at 5.) The ADA was not identified as a separate claim elsewhere in this case, including the petition, or in the remainder of the pretrial order. Therefore, just before trial, the court asked Plaintiff to clarify the claims in this case. (Doc. 55 at 2.) Plaintiff explained that the only claim was for negligence and that he would use the ADA as part of his theory to establish duty. (*Id.* at 3.) The court proceeded accordingly.

15-20 hours per week.  (*Id.* at 40.)  Now, Mr. Smith works 24-26 hours per week for Plaintiff.  (*Id.* at 41.)

The reason for this increase is that on July 4, 2023, Plaintiff suffered a fall outside of a Sleep Number store on a property owned by Defendant Menard.  (*Id.* at 54-55.)  At the time, Plaintiff was 73 years old.  (*Id.* at 61.)  Plaintiff drove himself and his wife to the Sleep Number store.  (*Id.* at 56.)  The weather that day was quite sunny and hot.  (*Id.* at 56, 81.)  Plaintiff parked his car in the far-right parking spot seen in the photograph below.  (*Id.* at 55.)



(Def. Ex. 804.)

To enter the store, Plaintiff and his wife each decided to go up the handicap ramp on the right side of the above photograph.  (*Id.* at 19.)  His wife was ahead of him.  (*Id.* at 21, 55.)  Plaintiff attributed his decision to take the accessible ramp on the right instead of the stairs on the left side of the photograph because he was "being kind of lazy."  (*Id.* at 55.)  As Plaintiff entered the sidewalk from the parking lot, he "tripped on that curb," while indicating to the images below

which were displayed as exhibits to the court. (*Id.*) Plaintiff indicated that he tripped on the grey pavement space directly adjacent and behind the yellow painted portion of the curb as shown in the images below. (*Id.* at 59.)[2]

 

(Pl. Ex. 3; Def. Ex. 803.) Plaintiff testified that he did not fall on the dotted orange handicap detectible warning mat. (*Id.* at 64.)

As a result of his fall, Plaintiff sustained a spiral fracture in his left femur. (*Id.* at 70.) The fracture ran from near the top of the femur to just above his knee. (*Id.* at 72.) Plaintiff's wife and employees from the Five Guys restaurant rushed to his assistance and called an ambulance. (*Id.* at 63.) Plaintiff was taken to a hospital, where he had surgery the following day. (*Id.* at 70.) After a few days in the hospital, Plaintiff was discharged to a "Health Care Resort", where he remained,

---

[2] The court has placed an X on one of the photographs that shows where Plaintiff indicated that he tripped during trial.

recovering from his injuries, for nearly the next three months until September 28, 2023.  (*Id.*)

Upon his release, he remained in a wheelchair.  (*Id.* at 71.)  At this point, a home health service

came to provide physical therapy services to Plaintiff.  Gradually, perhaps by the end of the year,

Plaintiff progressed from a wheelchair to walker.  (*Id.*)  Plaintiff attended a follow-up appointment

with his surgeon on December 23, 2023.  (*Id.*)  Plaintiff was scheduled to have another follow-up

appointment six months later.  (*Id.* at 84.)  Because he contracted COVID-19, he canceled that

appointment and never rescheduled.  (*Id.*)  When asked why he did not reschedule, Plaintiff said

he thought it was "an exercise of futility" because "it [the injury] was not getting any better."  (*Id.*

at 101.)

Unfortunately, this is not Plaintiff's first fall or serious injury.  In August 2017, Plaintiff

broke his left femur, near his hip, working on a house he was "flipping."  (*Id.* at 51.)  In September

and October of 2018, Plaintiff tripped and fell twice, breaking each of his wrists.  (*Id.* at 52-54.)

Plaintiff maintains however that these events were "aberration[s]" and that he had never previously

broken a bone.  (*Id.* at 54.)  Plaintiff explained that he had a complete recovery from these injuries

and was walking without assistive devices.  (*Id.* at 54-55.)  Since the July 4, 2023, fall though,

Plaintiff has been unable to walk without the assistance of a walker and has never returned to the

repair work he was doing prior.  (Doc. 55 at 41, 72, 74.)  Walking without a walker is "too painful

to do."  (*Id.* at 72.)

Plaintiff's medical records classify him as "morbidly obese."  (*Id.* at 95; Def. Ex. 811 at 2.)

Plaintiff also has arthritis, but "it's not severe" and "minor."  (Doc. 55 at 73, 89.)  That said, prior

to his fall, Plaintiff had acquired a handicap parking tag due to arthritis in his knees, and it was

noted in his medical records as "chronic pain."  (*Id.* at 89, 91.)  Plaintiff agreed that some

"combination of [his] weight, [his] injury, [his] arthritis, [his] injury, and maybe even that prior

injury" contributed to his condition and pain. (*Id.* at 73; 87-88.)  But he also explained that the July 2023 fall was the most "severe" issue.  (*Id.* at 73-74.)  Plaintiff stated that his arthritis worsened after his fall.  (*Id.* at 92-93.)  Finally, Plaintiff disputed a post-surgery medical record that described his left femur pain as "well controlled."  (*Id.* at 94.)

As seen above, the fall occurred on a piece of concrete in the parking lot of the property owned by Defendant Menard.  The parties elicited expert testimony about whether this piece of concrete was constructed improperly.  Plaintiff produced two experts.  Plaintiff's first expert, Mr. Robert Downey, described where Plaintiff tripped as an "improperly constructed flare."  (*Id.* at 114.)  A flare "is where the curb changes in elevation from the curb to the level of the parking lot." (*Id.* at 115.)  Mr. Downey explained that this definition comes from "archived" ADA "guidance." (*Id.* at 116-117.)  Current ADA regulations do not define the term "flare." (*Id.*)  But ADA guidance requires that "flares" have a maximum slope of 5.71 degrees.  (*Id.* at 122.)  Plaintiff's expert measured the "flare" in this case at 22.9 degrees.  (*Id.* at 122-23.)  This, according to Plaintiff's expert, renders the flare "improperly constructed."  (*Id.*)  Mr. Downey testified that Defendant Menard could have audited the property for ADA violations and either barred access to or reconstructed the "flare."  (*Id.* at 131.)

Plaintiff's second expert, Mr. Russell Kendzior, the self-proclaimed "buil[der] [of] the largest industry in the world" is a walkway safety specialist. (Pl. Ex. 21 at 39, 6.)  Mr. Kendzior largely concurred with Mr. Downey, however Mr. Kendzior referred to the area in question as a "curb."  (*Id.* at 29.)  He described the area as a "bad, very dangerous design" and creating a "hazardous condition."  (*Id.* at 15.)  Mr. Kendzior also determined that the area was part of the "accessible path" within the meaning of the ADA.  (*Id.* at 16.)  As a corollary, he determined that the area violated the ADA and the "International Building Code" due to it slope.  (*Id.* at 18-19,

6

21.)  Like Mr. Downey, Mr. Kendzior testified that Defendant could have rectified this problem by either blocking access or redesigning the area.  (*Id.* at 19-20.)  But in lieu of such a remedy, the area "was not reasonably safe."  (*Id.* at 28.)

Defendant produced its own expert, Mr. Christopher Francisco.  (Doc. 56 at 3.)  He is a licensed architect.  (*Id.* at 3-4.)  Mr. Francisco testified that the area in question did not violate the ADA or any relevant building codes.  (*Id.* at 11.)  He explained that the ADA is not a "safety standard" but is an "accessibility standard."  (*Id.* at 12.)  Mr. Francisco testified that the area in question is not a "flare" as "flares" are used when the travel of persons is expected "across the ramp" whereas here the "accessible route . . . does not cross the ramp" but is "perpendicular to it." (*Id.* at 14.)  Mr. Francisco testified that if the area in question is not a "flare" then the slope requirements alluded to by Plaintiff's expert do not apply.  (*See id.*)  Further, he testified that if the area is "outside of the – if it's outside the accessible path, the ADA doesn't regulate it."  (*Id.* at 15.)  Defendant's expert refers to the area in question as a "relaxed curb return."  (*Id.* at 17.) Defendant's expert indicated that a curb return does not have slope requirements.  (*See id.*)  Mr. Francisco additionally indicated that "this kind of thing is commonplace, and it would be done for various different reasons."  (*Id.* at 18.)

Defendant's expert also explained that "building codes" apply when "the building was constructed."  (*Id.* at 20.)  By contrast, the "International Property Maintenance Code applies [] to existing buildings."  (*Id.*)  In this case the City of Topeka adopted the 2021 International Property Maintenance Code.  (*Id.* at 21.)  In Mr. Francisco's opinion, the site complied with this code.  (*Id.* at 22.)  The gist of Mr. Francisco's testimony could be aptly summarized in his statement that "when people navigate areas, exterior areas, parking lots, sidewalks, there is not an expectation that everything is going to be perfectly flat and smooth. So, it's incumbent upon the individual

7

navigating the area to be paying attention and to understand and kind of do their own little risk assessment as they're utilizing the areas." (*Id.* at 24.)

## II.    Conclusions of Law

Premises liability claims in the State of Kanas "require a plaintiff to show four well-known elements—that a duty is owed to the plaintiff; that a breach of that duty has occurred; that the breach of duty has caused the plaintiff's injury; and that damages have been suffered by the plaintiff—in short: duty, breach, causation, and damages." *Corazzin v. Edward D. Jones & Co., L.P.*, 530 P.3d 445, 449 (Kan. Ct. App. 2023). Kansas courts have instructed that "the owner of a business is not the insurer of the safety of its patrons" but the owner does have "a duty to warn of any dangerous condition that the owner or operator knows about—or should know about—if exercising reasonable care while tending to the business." *Id.* (quoting *Cunningham v. Braum's Ice Cream & Dairy Stores*, 80 P.3d 35, 40 (Kan. 2003) (internal quotation marks omitted)).

For Plaintiff to "establish the existence of this duty, [he] must show that the owner or operator had actual knowledge of the condition, or that the condition had existed for long enough that in the exercise of reasonable care the owner or operator should have known of the condition." *Id.* There is an exception to this rule; a landowner has "no duty to warn of or to make safe any dangerous conditions that are known or obvious to a visitor." *Bonnette v. Triple D Auto Parts Inc.*, 409 P.3d 865, 871 (Kan. Ct. App. 2017) (citing *Miller v. Zep Mfg. Co.*, 815 P.2d 506, 514 (Kan. 1991)). Still, that exception dissipates "if the visitor is likely to be distracted when confronted with the dangerous condition and is, therefore, (1) not likely to discover the dangerous condition, (2) likely to forget the presence of the dangerous condition, or (3) not likely to protect against the dangerous condition." *Id.* This distraction rule does not apply for "mere[] inattentive[ness]." *Id.* at 872.

For a condition to be "known" or "obvious" to a visitor, the visitor must have knowledge of the existence of the condition and also "appeciat[e] [] the danger it involves." *Id.* at 871 (quoting *Didde v. City of Chapman*, No. 106,090, 2012 WL 3822735, at *3 (Kan. Ct. App. 2012) (internal quotation marks omitted)). Crucially, this is a reasonable man standard and is assessed objectively. *Id.* The question of law boils down to: would a reasonable person, "in the position of the visitor, exercising ordinary perception, intelligence, and judgment" notice the dangerous condition. *Id.*

Here, the court holds that a reasonable person should have noticed the condition on Defendant's property as it was "known or obvious to a [reasonable] visitor." *Id.* The court finds this because the front of the curb is painted bright yellow and it is plain that the concrete, both on the curb and behind it, slopes downward. (Pl. Ex. 3; Def. Ex. 803.) Along the route where Mr. Currier testified he was walking, the yellow curb and the slope would have been right in front of him. (Doc. 55 at 55; Pl. Ex. 3; Def. Ex. 803.) While one could argue the slope is slightly concealed because the portion of concrete is painted solid grey, this is mitigated by the yellow paint on the adjacent curb which indicates to the pedestrian walking that "there's a change in elevation" and this "visual cue", in the court's view, makes the slope more visible. (Pl. Ex. 21 at 95.) A reasonable person would assume that the concrete immediately behind the painted curb would slope at a similar or identical angle as the curb.

Put simply, Defendant Menard did not have a duty to Mr. Currier arising out of the curb because even assuming the curb was "not reasonably safe" (Pl. Ex. 21 at 28), and therefore constituted a dangerous condition, its existence was so open and obvious that a reasonable person

9

exercising ordinary care should have been able to avoid whatever danger originated therefrom.[3] *Wellhausen v. Univ. of Kansas*, 189 P.3d 1181, 1184 (Kan. Ct. App. 2008) ("However, the Restatement advocates an objective test to determine whether a danger is known and obvious.").

None of the exceptions to that rule apply in this case. Mr. Currier was not likely to be distracted for any reason attributable to Menard, and therefore "(1) not likely to discover the dangerous condition, (2) likely to forget the presence of the dangerous condition, or (3) not likely to protect against the dangerous condition." *Bonnette*, 409 P.3d at 871. In addition, these exceptions are applied in "very limited circumstances." *Wellhausen*, 189 P.3d at 1184. Instead, this appears to be a classic case of "mere[] inattentive[ness]." *Bonnette*, 409 P.3d at 872. For mere inattentiveness, a claim against Defendant cannot lie.

## III.    Judgment

For the foregoing reasons, the court directs the clerk to enter judgement for DEFENDANT. IT IS SO ORDERED. Dated this 27th day of April, 2026.

s/ John W. Broomes

JOHN W. BROOMES
CHIEF UNITED STATES DISTRICT JUDGE

---

[3] This is true even if the construction of the ramp violates applicable building codes or the ADA. For one, Plaintiff did not plead a negligence per se claim but instead pled only simple negligence. *See Shirley v. Glass*, 308 P.3d 1, 5-6 (Kan. 2013) (holding that Plaintiff had not pled a separate negligence per se claim but still evaluating whether statutory violations could be used as evidence of the standard or care). Second, courts have discouraged the use of the ADA in negligence per se actions "because its purpose is to prevent discrimination, not personal injuries." *Moore v. Waffle House, Inc.*, No. 23-CV-5873-SAL, 2025 WL 1880244, at *6 (D.S.C. Apr. 15, 2025) (collecting cases). With that in mind, the only use for the ADA or building codes is as evidence of the breach of a duty. *Glass*, 308 P.3d at 5-6. But, as explained, there is no duty here because the danger was open and obvious, so any violation of the ADA or applicable building codes is immaterial. *Bonnette*, 409 P.3d at 871 ("But a landowner generally has no duty to warn of or to make safe any dangerous conditions that are known or obvious to a visitor.").